**William Francis QUICK,
Petitioner, Appellant,**

v.

**COMMISSIONER OF PUBLIC
SAFETY, Respondent.**

**No. CX-88-265.**

Court of Appeals of Minnesota.

Sept. 27, 1988.
Review Denied Nov. 23, 1988.

Lawrence E. Maus, Baudler, Baudler, Maus & Blahnik, Austin, for petitioner, appellant.

Hubert H. Humphrey, III, Atty. Gen., Joel A. Watne, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by FOLEY, P.J., and HUSPENI, and SHORT, JJ.

## OPINION

HUSPENI, Judge.

Appellant was arrested for DWI and took a breath test showing an alcohol concentration of .11. His driver's license was revoked. He obtained additional blood and urine tests and presented testimony in support of his argument that his alcohol concentration had been less than .10. The trial court sustained the revocation and Quick appeals. We affirm.

## FACTS

State Trooper Malachy Paul McCarthy was on duty on May 24, 1987, when he stopped appellant William Francis Quick for speeding. McCarthy observed signs of intoxication and gave appellant field sobriety tests, which Quick performed incorrectly. On the one-legged stand test, after being given instructions three times, appellant counted to ten with both feet on the ground instead of standing on one foot. McCarthy believed appellant's physical symptoms were consistent with drivers who received test results of an alcohol concentration over .10. He arrested appellant for violation of Minn.Stat. § 169.121 (1986).

At approximately 10:42, McCarthy requested that appellant take a breath test. McCarthy observed appellant for 15–20 minutes, during which time he had nothing to eat or drink, placed nothing in his mouth, and did not vomit or regurgitate.

State Trooper Paul Blaha, a certified Intoxilyzer operator, administered the test. He checked appellant's mouth to ensure there were no foreign substances. The diagnostic test indicated "OK" and the temperature of the unit was within the proper range. During the course of the test sequence, four air blank tests were run, with readings of .000, the anticipated result. The calibration standard was .105, with a replicate of .105, also within the proper range. Nothing suggested the machine was giving an erroneously high reading.

Appellant then provided two adequate breath samples. The first subject test showed an alcohol concentration of .117 with a replicate reading of .120. The second sample result was .119 with a replicate reading of .121. The correlation between the two samples was 99 percent, with a final reported value of .11.

Appellant testified in detail as to the events which occurred prior to his arrest. He visited a number of friends, and estimated that during the evening he had six drinks which contained seven or, at most, eight ounces of alcohol.

When appellant was stopped and arrested by the police officer for speeding, Dennis Stenberg, whom appellant had visited earlier, happened to drive past the scene. He stopped and drove appellant's car to the police station.

After appellant took and failed the breath test, Stenberg drove him to a hospital to obtain additional tests. At the hospital, Peggy Erwin supplied appellant with a urine kit and gave him instructions. At approximately 12:35 a.m., while alone in the bathroom, appellant urinated in the bottle. He then gave Erwin the sample and she sealed it. It was sent for analysis, with results showing an alcohol concentration of .036 and .038. The Commissioner objected to the admissibility of this evidence.

The blood sample was drawn at 12:40 a.m. Erwin gave it to appellant, because it was determined the hospital would not send it for analysis. Appellant gave it to Stenberg, who kept the sample refrigerated until he brought it in for analysis. The sample was ultimately analyzed at the Mayo Clinic in Rochester, and showed an alcohol concentration of .0588. The Commissioner also objected to the introduction of this result.

William Flynn, an attorney who was previously employed by the Bureau of Criminal Apprehension as a crime laboratory analyst, testified. Flynn used the result of the urine test to extrapolate backwards to appellant's alcohol concentration at 10:52, which Flynn estimated would have been .063. Flynn then extrapolated backwards using the alcohol concentration of .0588 obtained from the blood sample, and arrived at a result of .083 or .084.

Flynn also estimated appellant's alcohol concentration using the amount of alcohol appellant testified he had consumed, seven ounces, the time at which it was consumed, and appellant's weight, and estimated that appellant's alcohol concentration at 10:52 was .04. If the amount of alcohol consumed was eight ounces, the alcohol concentration at 10:52 would be .058. He testified this was very close to the urine test result, and the blood test result, but inconsistent with the breath test result.

Rebuttal testimony was given by Edward Alan Engman, a BCA employee who has analyzed thousands of blood and urine samples and is currently an Intoxilyzer instructor and a technician responsible for maintaining Intoxilyzers. He reviewed the test record and other lab records relating to the particular Intoxilyzer used and found nothing to suggest the Intoxilyzer was not working properly or that the test was not administered properly. He testified that when drawing a forensic urine sample, the proper procedure is to have the person administering the test actually see the subject urinate in the container, and this was not done here.

Engman agreed with Flynn's calculations as to the extrapolations of alcohol concentration. However, he also testified that certain events could affect the alcohol concentration of a urine sample, such as the alcohol could leak. Finally, Engman testified that it was his opinion that the Intoxilyzer test results were an accurate reflection of the subject's breath alcohol concentration.

The trial court found that the Intoxilyzer testing method was valid and reliable and the test results were accurately evaluated.

In a memorandum incorporated by reference, the court addressed the independent tests obtained by appellant.

The Commissioner of Public Safety objected to the admission of Petitioner's Exhibits 3, 4 and 5. Exhibits 3 and 4 [the urine test] are clearly admissible under M.S. 169.123, subd. 6. The admissibility of Petitioner's Exhibit 5 [the blood test] is not so clear since the exhibit bears no signature or certification. However, the Court is admitting the exhibit pursuant to Rule 9.01, Rules of Evidence. The lack of a verification affidavit can, of course, be considered with respect to the weight to be given to the exhibit.

The trial court sustained the revocation.

## ISSUE

Was the trial court clearly erroneous in determining that the testing method was reliable and that the test results were accurately evaluated?

## ANALYSIS

The implied consent law provides that any person who drives a motor vehicle consents, subject to certain provisions, to a chemical test for the purpose of determining alcohol concentration. Minn.Stat. § 169.123, subd. 2(a) (1986).

■ The law further provides for additional testing:

The person tested has the right to have someone of the person's own choosing administer a chemical test or tests in addition to any administered at the direction of a peace officer; provided, that the additional test sample on behalf of the person is obtained at the place where the person is in custody, after the test administered at the direction of a peace officer, and at no expense to the state.

Minn.Stat. § 169.123, subd. 3 (1986). This subdivision is an affirmation of the right of persons held in custody to have an independent test administered while being held. *Frost v. Commissioner of Public Safety,* 348 N.W.2d 803, 805 (Minn.Ct.App.1984). It does not restrict the manner in which a

released driver obtains independent tests, nor does it impose a duty on an officer to continue to hold the person in custody until additional tests can be administered. *Id.*

■ Appellant argues that if the court, after admitting evidence of additional tests as required by statute, can then disregard the additional tests simply because the state's test was properly administered and yielded a result of over .10, the right to have additional tests is without substance. We cannot agree. The statute does nothing more than affirm the right to have additional testing performed while being held. The statute does not restrict the manner in which a driver who has been released from custody obtains independent scientific tests. Once obtained, any such tests must meet the usual evidentiary standards to be admitted into evidence. *Frost,* 348 N.W.2d at 805. Neither the statute nor case law compels the court to accept the results of additional testing rather than the test requested by the officer pursuant to the statute. Instead, the court must weigh all evidence before it and make a determination.

■ Appellant asserts that the trial court failed to indicate whether it considered the test results he offered. If it did so, appellant argues, it did not explain why it accepted the Intoxilyzer test result of an alcohol concentration of .11 over the clear weight of the evidence which supported his contention his alcohol concentration was below .10.

The trial court, in a memorandum, held that it was admitting the blood and urine test results into evidence, over the Commissioner's objections, noting that one of the objections went to the weight of the exhibit. While our review would be assisted by more complete trial court findings, and we are somewhat troubled by the trial court's failure to provide them, it is apparent that the trial court did consider all the test evidence before it and gave greater weight to the Intoxilyzer test result in making the ultimate determination that revocation of appellant's license be sustained.

Appellant argues that he rebutted the Commissioner's prima facie case, that the state did not rebut his prima facie case, and that the trial court was clearly erroneous in accepting the Commissioner's evidence over his own. He asserts that the burden shifted back to the state to prove that the independent tests were untrustworthy. *State v. Dille,* 258 N.W.2d 565, 567–68 (Minn.1977) (proponent of test has the burden of making a prima facie showing that the test is reliable and burden then falls on the opponent to show why the test was untrustworthy). Appellant also asserts that in attacking the independent test results, the Commissioner must be held to the same high standard that a driver must meet in challenging the accuracy of a test administered upon request of a peace officer. Appellant argues that the attack on the independent tests must not be based on mere speculation or conjecture but must be supported by concrete evidence. *See Bielejeski v. Commissioner of Public Safety,* 351 N.W.2d 664, 666 (Minn.Ct.App.1984).

The Commissioner contends, however, that there is no testimony that a BCA kit was used to collect the urine sample, and that the proper urine test procedure, which calls for collection within sight of a witness, was followed. Further, no witness was called to provide foundation for the urine analysis itself. He contends similar problems arose with the blood test, arguing no evidence was offered as to the nature and contents of the collection kit and that no foundation was laid for the test.

The Commissioner argues that in contrast to the test evidence offered by appellant, the breath testing method was valid and reliable and the test results were accurately evaluated to show an alcohol concentration of .11. The troopers were certified Intoxilyzer operators, and all indications were that the test was proper. The Commissioner's expert expressed his opinion that the breath test accurately reflected an alcohol concentration of .10 or more.

We do not have before us a situation in which all prescribed safeguards were implemented to ensure the accuracy of appellant's independent tests. The trial court was presented with conflicting testimony. It was required both to assess credibility

and to determine weight. It credited the Commissioner's evidence over appellant's evidence. Under these facts, we must conclude that the trial court was not clearly erroneous in accepting the Intoxilyzer test result and rejecting the test results offered by appellant. The Intoxilyzer test results were over .10, and all of the indications showed that the test was properly performed and gave an accurate result. *See Berge v. Commissioner of Public Safety,* 374 N.W.2d 730, 733 (Minn.1985).

### DECISION

The order of the trial court sustaining the revocation is affirmed.

AFFIRMED.